H. G. SHERRILL v. JNO. P. LITTLE ET AL.

(Filed 11 May, 1927.)

**Release—Contracts — Negligence — Fraud — Ratification — Rescission—Equity.**

Where a master is liable in damages to its employee for a serious injury caused by its negligence, and while the employee is too incapacitated physically and mentally to understand it, obtains a release, upon a reasonably fair consideration to be paid at stated periods, from all liability for damages that may thereafter be claimed, and continues to receive these payments knowingly as paid upon the release after he has had full opportunity to acquaint himself with and understand its terms, he may not thereafter disregard his release though obtained by fraud and overreaching, and maintain an action to recover the actual amount of the damages.

CIVIL ACTION, tried before *R. Lee Wright, Emergency Judge,* at January Special Term, 1927, of MECKLENBURG.

The evidence tended to show that the plaintiff was a carpenter, employed by the defendants, who were engaged in the business of general contractors and builders in the city of Charlotte.

On 1 October, 1924, the plaintiff was directed to straighten up some of the upright posts that were out of line on the Charlotte Speedway grandstand. While engaged in this work, the scaffold upon which plaintiff was standing gave way and he fell, sustaining serious injuries. He was taken to the hospital, where he remained twenty-three days, and then returned to his home in Newton. On or about 1 May, 1925, the plaintiff returned to work for the defendants, and worked with them until October, 1925. Plaintiff testified that, at that time, they told him if he wanted to go up to Salisbury they would see whether or not they could get work for him. Plaintiff declined to go to Salisbury, and his employment with the defendants was thereupon terminated.

On 3 October, 1924, on the third day after his injury, and while in the hospital, plaintiff signed a release, which is in words and figures as follows:

"In consideration of the release hereinafter set out, the undersigned, John P. Little & Son, hereby agree to pay the doctor's bills, hospital bills, and time lost by the undersigned, H. G. Sherrill, on account of injuries received by his falling from a scaffold while working on the grandstand at the Speedway near Pineville, N. C., time lost to be paid for at the rate of sixty cents (60c.) per hour, forty-eight (48) hours per week: *Provided, however,* that this shall not be paid for longer time than said Sherrill is disabled from work on account of said injury, this to be left to the decision of Dr. C. M. Strong, nor in any event for a longer time than three months from the date of said injury, which was on 1 October, 1924.

"And in consideration of the agreement aforesaid on the part of John P. Little & Son, the said H. G. Sherrill hereby agrees to release and does release the said John P. Little & Son from all further liability on account of said injuries; it being understood that this is a full settlement between the parties for all damages sustained by said H. G. Sherrill on account of said accident. And it is understood that the said John P. Little & Son do not admit negligence or responsibility on their part for said accident."

In accordance with the terms of this release, the defendants sent the plaintiff a check for $36 each week until about 1 May, 1925, when the plaintiff returned to work. The doctor's bill was $210, and the hospital bill $153.25, and including these items and some small expense items, the defendants paid the plaintiff under the contract the sum of $1,569.50. At the time the release was signed, a copy thereof was left with the plaintiff, which he produced at the trial.

The issues and answers of the jury thereto were as follows:

"1. Did the plaintiff, at the time of executing the release set forth in the answer of the defendants, have sufficient mental capacity to understand the nature and legal effect of said release? Answer: 'No.'

---

SHERRILL *v.* LITTLE.

---

"2. If not, did the defendants, or either of them, have notice at the time of the execution of the said release of plaintiff's lack of such mental capacity? Answer: 'Yes.'

"3. Did the plaintiff ratify the said release by continuing to receive payments of the installments of the consideration mentioned in the said release after having knowledge of the nature and contents of the said release? Answer: 'No.'

"4. Was the plaintiff injured by the negligence of the defendants, as alleged in the complaint? Answer: 'Yes.'

"5. Did the plaintiff, by his own negligence, contribute to his injuries, as alleged in the answer? Answer: 'No.'

"6. Did the plaintiff assume the risks incident to his employment, as alleged in the answer? Answer: 'No.'

"7. What damages, if any, is the plaintiff entitled to recover? Answer: '$3,000, plus $1,553.50—$4,553.50.' "

Judgment was entered upon the verdict, and the defendants appealed.

*McCall & Humphrey for plaintiff.*
*C. H. Gover for defendants.*

BROGDEN, J. There was sufficient evidence of negligence to be submitted to the jury. There was also sufficient evidence to be submitted to the jury on the first and second issues, as to whether or not the plaintiff had sufficient mental capacity to understand the legal effect of the release at the time it was executed, and of notice to the defendants of such incapacity.

The merits of the case revolve about the question as to whether or not the plaintiff ratified the release, even conceding that it was secured by means of fraud and over-reaching.

The law with respect to releases has been thoroughly examined and set forth in an exhaustive and well-considered opinion by *Justice Connor* in *Butler v. Fertilizer Works, ante,* 632. The *Butler case, supra,* deals primarily with the principles of law affecting the validity of releases, and is a recapitulation and reëxamination of the law with regard to circumstances and conditions warranting the rescission of such instruments. The case at bar involves the facts and circumstances under which a release may be upheld. "A release executed by an injured party and based upon a valuable consideration is a complete defense to an action for damages for the injuries, and where the execution of such a release is admitted or established by the evidence, it is necessary for the plaintiff to prove the matter in avoidance of the release." *Aderholt v. R. R.,* 152 N. C., 412.

The plaintiff contends that the release is not binding by reason of the fact that he did not understand what he was doing when it was signed, and that the defendants, with unseemly haste, presented the paper to him without any explanation of its terms whatever, and secured his signature at a time when he was suffering such pain as to be unable to understand its effect and meaning.

The defendants deny that any fraud was practiced upon the plaintiff, but contend that, even though the plaintiff did not understand the paper at the time it was signed, his acceptance of the benefits specified therein for a period of seven months amounts to a ratification of the contract, irrespective of its alleged fraudulent inception.

These contentions require an examination of the evidence to the end that the principles of law may be properly applied.

Plaintiff testified as follows: "The accident happened between eight and nine o'clock in the morning. I don't remember anything else the balance of that day. I regained consciousness the next day about ten o'clock. . . . They told me that my wife came the second day after I was hurt. . . . They said she was with me on 3 October. . . . I remember her being at the hospital, but I don't remember the time it was. The signature on this paper is mine. (Referring to the release.) I gave this paper to my attorney, or one like it. . . . My wife gave me that paper after I went home from the hospital and after I went back to Newton. I don't remember when she gave it to me after I went home. I went home on 23 October. . . . I don't remember anything about what took place at the time I signed this paper. . . . I don't remember a thing on earth about signing this paper. . . . When I went home my wife gave me this paper, and I read it then. I didn't understand it altogether. I really did not understand the meaning of the wording. I haven't got no education. As to whether I understood enough about it to send down to J. P. Little & Son and get the checks, they mailed them to me. I don't know as I sent for them. After I got well enough I did go to the office of J. P. Little & Son. . . . I got a check practically every week from J. P. Little & Son from the time I got hurt until I went back to work for them. I got a check from them practically every week from the first of October, 1924, until some time in May, 1925. At the time in May, 1925, mentioned, I went back to work for J. P. Little & Son. They continued to employ and pay me until they brought me a check one evening and told me they did not need me back there. This was 1 October, 1925. It is a fact that I was paid so far as I can recall every week from 1 October, 1924, until May, 1925, at the rate of $36 per week, or sixty cents an hour. This was according to what the contract of J. P. Little & Son called for when I seen it. I knew the checks were being sent to me every week by J. P.

Little & Son according to the terms of this contract here (referring to the release). I knew they were carrying out their contract with me and giving me a check every week. . . . If my wife showed me this paper (the release) in the hospital, I don't remember about it. She talked to me about it while I was in the hospital, but if I saw it or read it or heard it read, I don't know it. . . . I got checks while I was in the hospital. According to what my wife told me, these checks were sent pursuant to the terms of that paper, but I did not know. . . . The paper said that it released J. P. Little & Son from liability on account of the injuries. I understood the reading when I read that part of it. I understood what the language meant. I did not understand exactly that it put me out as to where I could not get anything if I never got well. My understanding was that I was to get well, sound like I was. When my wife gave me the paper at Newton, I did read it. . . . I never did object to the contract, and did not go to them. I never said a word to them about objecting to the contract that I know of. . . . I was not satisfied from the first. . . . I don't know what time after I got home my wife showed me the release signed by me. I wouldn't be sure I read it before some time in December. I will admit reading it by that time. . . . I will also admit that I endorsed and cashed those checks and got the money. I knew in cashing those checks that this paper was in existence."

The general principle of ratification is thus expressed in Ruling Case Law, vol. 23, p. 389 : "A release, originally invalid or voidable for any reason, may be ratified and affirmed by the subsequent acts of the persons interested. Thus, if one, while his reason is temporarily dethroned, executes a release, and, after being restored to his proper faculties, knowingly takes the benefit of his contract, he thereby ratifies and gives it force and effect. . . . And there can be no ratification or affirmance unless the plaintiff knew, or ought to have known, all the facts and circumstances attending the act to be ratified. Ratification presumes the existence of knowledge of all the facts, and one not informed of the whole transaction is not in a position to ratify the same. Nor is the receipt of money an affirmance of a release, unless paid in satisfaction of the plaintiff's cause of action, or received after he knew, or ought to have known, that he had a cause of action, and that the money was paid in satisfaction of it." This general principle of law is fully recognized and is given full force in the decisions of this State. *Dellinger v. Gillespie,* 118 N. C., 737; *Kerr v. Sanders,* 122 N. C., 635; *May v. Loomis,* 140 N. C., 359; *West v. R. R.,* 151 N. C., 231; *Bank v. Justice,* 157 N. C., 373; *Starkweather v. Gravely,* 187 N. C., 526; *Waggoner v. Publishing Co.,* 190 N. C., 831; *McNair v. Finance Co.,* 191 N. C., 710. In *Dellinger v. Gillespie, supra,* the Court said : "Upon discover-

ing that the written contract was unlike the contract which he alleged he had made with the plaintiff, he should not have allowed the work to go on. Equity will not permit him, under such circumstances, even if there was fraud in the contract, to allow the plaintiff to complete the work and then refuse to pay for it. If the contract had been procured through fraud, as the defendant alleged, he ought, when he had examined it the next morning before Uzzell began the work, to have repudiated it and have forbidden the commencement of the work, or he should have made his election to abide by it, as it was written, with the explicit declaration, then made, of his intention to sue the plaintiff in damages for the deceit."

Applying the established rules of law to the facts of this case, it appears that, after the plaintiff had left the hospital, he continued to receive payments from the defendants, and at the time knowing that such payments were made in accordance with what the "contract with J. P. Little & Son called for." And said payments were accepted with the further knowledge on the part of the plaintiff that the contract "released J. P. Little & Son from liability on account of the injuries."

The defendants, in apt time, and in writing, requested the court to instruct the jury to answer the third issue, as to ratification, "Yes." We are of the opinion, and so hold, that the defendants were entitled to this instruction, and that the court was in error in declining to give it.

The plaintiff relies upon the case of *Mensforth v. Chicago Brass Co.,* 126 N. W., 41. In the *Mensforth case* plaintiff received a serious injury and signed a release for the sum of $100, which, at most, was but a trifling amount. The paper was signed when the plaintiff had only been in the hospital ten days, and he remained there fourteen or fifteen weeks thereafter. It appears that the $100 was paid to the plaintiff in three installments, but it further appears that "nothing was said when the money was paid to him as to what it was for." In the case at bar, the plaintiff was thoroughly advised as to what the money was for, and, according to his own statements upon the witness stand, knew that the paper-writing released the defendant from liability. Even if the defendants acted with undue haste in securing a release, the record discloses that they were not disposed to drive a hard bargain with the plaintiff; for, although the contract specified they were to pay no compensation in excess of a period of three months, yet the defendants did not stand upon the letter of the bond, but actually paid compensation to plaintiff for seven months, and until he was able to resume his labors with them.

Error.