D. M. HILL AND JOHN F. BRUTON, TRUSTEE, v. THE STAR INSURANCE COMPANY OF AMERICA; MERCURY INSURANCE COMPANY OF ST. PAUL, MINN.; ÆTNA INSURANCE COMPANY OF HARTFORD, CONN.

(Filed 25 March, 1931.)

1. **Arbitration and Award E d—Where award is void for fraud parol evidence as to amount of damage is admissible.**

    Where a policy of fire insurance contains an agreement to arbitrate the amount of loss thereunder in case of disagreement between the insurer and insured, each to select a disinterested person and the two thus selected to select a third to act in case they did not agree, and the evidence is sufficient to go to the jury on the question that the award was conditionally signed and there was evidence of fraud vitiating this feature of the policy, parol evidence as to the amount of the loss sustained by fire under the terms of the policy is competent to show the loss actually sustained by the insured, not in contradiction of the written instrument, for upon the establishment of the fraud the relevant portion of the policy is disregarded.

2. **Arbitration and Award E c—Evidence that award was conditional and fraudulent held sufficient to be submitted to jury.**

    Where an arbitration stipulation in a policy of fire insurance requires that in case of loss the insurer and insured should each select a competent and disinterested person to act for them, and the persons thus selected should select a third to act in case they could not agree, and

there is evidence that the insurer had selected one of its experienced adjusters who induced the arbitrator selected by the insured, inexperienced in such matters, to sign an award under the misrepresentation that the third arbitrator would have to pass upon the amount of the loss, and with this understanding the award was signed, and that the award was grossly inadequate: *Held*, sufficient to be submitted to the jury upon the issue of the actionable fraud of the insurer vitiating the award.

**3. Arbitration and Award C a—Arbitrators appointed by parties under agreement must be disinterested.** ·

Where a contract of fire insurance provides that in case of loss where the insurer and insured cannot agree upon the amount that they should appoint a disinterested person, and that the two thus selected should appoint a third, the general qualifications of the persons thus selected are that they should not be interested, biased, or prejudiced, and evidence that the person appointed by the insurer was frequently employed by the insurer who paid him a fee is not conclusive that such appointee is not qualified, but is evidence to go to the jury as to his qualification.

APPEAL by defendant from *Cranmer, J.,* and a jury, at November Term, 1930, of WILSON. No error.

These are actions brought by plaintiffs against the defendants to recover on certain insurance policies, in the aggregate of $6,500 on the home of plaintiff, D. M. Hill, which was practically destroyed by fire on 27 October, 1928. The plaintiff, John F. Bruton, was trustee to secure certain indebtedness on the property and the policies had attached the New York Standard mortgage clause in his favor as trustee. The loss and damage under said policy was payable to him as his interest may appear. The policy had attached what is known as a 75 per cent coinsurance clause. The actions were consolidated and plaintiffs' claim for damage, the minimum, amounted to $5,174.

Defendants in their answer set up that under the terms of the policy, that when no agreement could be arrived at between the parties, as to the amount of the loss, an appraisal should be had and the method fixed by the policy. The assured selected R. D. Gladding and the defendants selected W. B. Barrow, and the two selected as umpire one D. J. Rose. That Gladding and Barrow appraised the sound value at $4,500, and loss and damage at $2,445.79. That said amount was tendered to plaintiffs on 28 January, 1929, which plaintiffs declined to accept. That "said award in writing was signed by each of the appraisers selected by the assured and by the company and is binding under the terms of the said policy upon the said plaintiff and upon the defendants, and by reason thereof and of the matters and things herein set forth, the said plaintiffs are estopped to claim that the said loss and damage to the property insured, by the said fire occurring on or about 27 October, 1928, is in excess of $2,445.79."

The plaintiff in reply stated that the terms of the policy provided: "In case the insured and this company shall fail to agree as to the amount of loss or damage, it shall, on the written demand of either, select a *competent and disinterested appraiser.*" That W. B. Barrow was not a disinterested appraiser, but "the said W. B. Barrow, for a long time prior thereto, had been practically a regular appraiser of the Southern Adjustment Bureau, and in making appraisals, and in making this appraisal, the said W. B. Barrow acted as the representative of defendant companies, and not as a disinterested appraiser." This was unknown to plaintiff. "That the said W. B. Barrow, instead of considering himself an impartial appraiser, considered himself as the direct representative of the defendant companies in making said appraisal; that he entered into the said appraisal, not for the purpose of ascertaining the true loss and damage, but for the purpose of reducing the loss and damage to the very lowest possible figure, regardless of whether or not such lowest possible figure should represent the true and correct loss and damage or not. . . . That the said W. B. Barrow soon ascertained that R. D. Gladding was inexperienced, and took advantage of the inexperience of the said R. D. Gladding, in making said appraisal; that the said R. D. Gladding declined to sign the appraisal report until he was assured by the said W. B. Barrow that the final estimate of loss and damage would be passed upon by D. J. Rose, the umpire selected, and that it was only upon the assurance given him by W. B. Barrow that D. J. Rose would pass upon and make the final estimate of loss and damage, that the said R. D. Gladding signed the said appraisal agreement. . . . The said W. B. Barrow taking advantage of the inexperience of R. D. Gladding, assured him that the said D. J. Rose would make the final estimate of the loss and damage, and procured his signature to the said appraisal agreement by such assurance, although the said W. B. Barrow knew at the time of making such assurance, that under the strict letter of the appraisal agreement the same were false and untrue. . . . That the purported appraisal and award signed by the appraisers, R. D. Gladding and W. B. Barrow, constituted a fraud upon the rights of these plaintiffs, and for the further reason that the amount arrived at therein was so grossly and palpably inadequate and unjust and so out of proportion to the amount of actual damages as to be inequitable and unconscionable. The actual amount of the damage was a minimum of $5,174, whereas, the figure arrived at by the methods employed by the said W. B. Barrow amounted to only $2,445.79, a discrepancy of more than $2,700 between the actual and the awarded damages and an amount less than one-half of the actual amount of the damage. These plaintiffs aver that the purported appraisal arrives at such an outrageously and palpably inadequate conclusion as to be apparent that it is a fraud upon these plaintiffs."

The issues submitted to the jury and their answers thereto were as follows:

"1. Has there been an appraisal and award as to the amount of damages to which plaintiffs are entitled under the insurance policies sued on in this action? Answer: Yes.

2. Was the appraiser, W. B. Barrow, at the time of the alleged appraisal and award, disinterested? Answer: No.

3. Was the appraiser, R. D. Gladding, unduly and fraudulently influenced and controlled in the interest of the defendants by said W. B. Barrow? Answer: Yes.

4. Was the signature of the appraiser, R. D. Gladding, to the alleged appraisal obtained by the fraud and misrepresentation of said W. B. Barrow? Answer: Yes.

5. Was the appraiser, W. B. Barrow, partial to and strongly biased and prejudiced in favor of the defendants? Answer: Yes.

6. What were the damages done by fire to the property of plaintiffs included in the policies? Answer: $5,172.98 and interest."

The court below upon the verdict signed judgment. The defendants made numerous exceptions and assignments of error and appealed to the Supreme Court. The material facts and necessary assignments of error will be considered in the opinion.

*H. G. Connor, Jr., M. S. Strickland and Finch, Rand & Finch for plaintiff.*

*W. A. Lucas and Manning & Manning for defendants.*

CLARKSON, J. We think the crux of this action is embodied in the following exceptions and assignments of error made by defendants: "(1) The court erred in admitting in evidence, over the objection of the defendants, aptly made, testimony tending to prove the sound value and loss and damage to the property otherwise than as shown by said appraisal agreement and award made thereunder, for that both parties were bound by the award thus made; and the said award determined the amount of sound value and the loss or damage; and (2) the refusal of the court below, on motion of defendants at the close of the plaintiff's evidence and at the close of all the evidence for judgment as in case of nonsuit, and for any further recovery than the judgment tendered in the answer." C. S., 567.

Under the facts and circumstances of these actions we think the court below correctly overruled these exceptions and assignments of error. These are actions in effect to set aside the award for fraud, corruption, undue influence and bias.

In *Miller v. Farmers Federation,* 192 N. C., at p. 146, we find: "Parol testimony cannot be admitted to contradict, add to, or vary a

written contract in the absence of fraud, ignorance, mistake or other available defense, warranting a rescission or cancellation. This rule is intended for the 'protection of the provident' and not for the 'relief of the negligent.' *Patton v. Lumber Co.,* 179 N. C., 103; *Watson v. Spurrier,* 190 N. C., 729."

We find also in the authorities that although the contract is in writing and signed that conditions and collateral agreements under certain circumstances are permitted to be shown. In *Herndon v. Ins. Co.,* 110 N. C., at p. 284, it is said: "If the award was signed when it was incomplete, because of the false assurance given by one of the adjusters, the others who were present acting in concert with him, will not be allowed to claim for their companies that they shall be permitted to reap the benefit of the falsehood."

In *Kelly v. Oliver,* 113 N. C., at p. 444, it is said: "This being so, it was competent for the defendant to show that, although he signed the instrument, it was not to go into effect, as to him, until the plaintiff had procured the signatures of twenty others to the same. This does not contradict the terms of the writing, but amounts to a collateral agreement, postponing its legal operation until the happening of a contingency. *Penniman v. Alexander,* 111 N. C., 427." *Mercantile Co. v. Parker,* 163 N. C., 275; *Buie v. Kennedy,* 164 N. C., 290; *Thomas v. Carteret,* 182 N. C., at p. 378; *White v. Fisheries Co.,* 183 N. C., at p. 229-30; *Watson v. Spurrier,* 190 N. C., at p. 730. See *Bank v. Winslow,* 193 N. C., 470; *Crown Co. v. Jones,* 196 N. C., 208; *Stockton v. Lenoir,* 198 N. C., 148.

On this aspect, that the award was signed conditionally and the aspect of fraud, and the aspect that Barrow was not a disinterested appraiser, the evidence was to the effect: R. D. Gladding testified in part: "Q. What took place between you and Mr. Barrow before you signed that appraisal agreement? A. I asked Mr. Barrow would my signature on that paper prevent Mr. Hill from taking the matter further to Mr. Rose if he so desired if he was dissatisfied. Mr. Rose was the umpire chosen by Mr. Barrow and myself. Mr. Barrow told me in his opinion he could, and I signed the paper. Q. Why did he say he could? A. Mr. Barrow told me he had appraised several buildings before, and I assumed he knew that point of the matter, and I relied on that before I signed it. I would not have signed it if he had not told me that. Immediately after signing it I took one copy of it and showed it to Mr. Hill and told him that was the result of our appraisal, but that if he was not satisfied he could take the matter to Mr. Rose for final judgment, or words to that effect. In consequence of what Mr. Hill said I went back down stairs and found Mr. Hoff (manager of Southern Adjustment Bureau) and Mr. Barrow, and took them to Mr. Hill's

office. Mr. Hoff was an insurance man, is all I know. Q. What did Mr. Hill state to them in reference to what you had told him? A. He said that he was not satisfied with the appraisal, and the understanding was that he could submit it to Mr. Rose. That is what he said at first; that was the substance of it. He asked to take it up to Mr. Rose. I don't know exactly what Mr. Hoff said to that. I don't remember exactly what he did say except I know that everything that was said in connection with that was refused by Mr. Hoff."

On 20 November, 1928, Gladding wrote Barrow: "When you and I met to appraise the loss sustained by Mr. D. M. Hill, of Wilson, N. C., in a recent fire, his residence, it was distinctly stated by me and acquiesced in by you before I signed the appraisal agreement, that this report would not be binding upon Mr. Hill without his assent. I asked you the direct question if it would be binding upon Mr. Hill without his assent before I signed it, and you stated that it would not be. I repeated this statement in the presence of Mr. Hill and Mr. Hoff, and you again assented to it, or that such was your understanding. I now learn that the Southern Adjustment Bureau, acting for the companies, takes the position that notwithstanding this distinct understanding between us, these figures are binding upon Mr. Hill without any further act on the part of Mr. Rose or any one else. In view of the facts herein stated, I take this opportunity to say to you that I withdraw my signature from the said appraisal agreement. I never would have signed the same but for the understanding which I had, and I think that you know I would not."

The testimony of Gladding was corroborated by Hill and the following portion of letter, dated 21 December, 1928, relating to the matter, written to Hoff by Hill, was introduced in evidence: "I do not believe that you will controvert that fact that one of the appraisers, Mr. Gladding, stated in the presence of yourself, Mr. Barrow and me, that at the time the purported estimate was made, that it was conditional; and you stated that if that were the case, it should be threshed out then, and asked me what I thought should be done. I stated to you, that while I did not know Mr. Barrow, I presumed he was a reputable contractor and that it would be entirely agreeable to me for him to put my home back in as good condition as it was before the fire; that all I wanted was the amount of the loss I had suffered—and Mr. Barrow spoke up and said, 'No, I wouldn't come here and do it for three times that amount.' I then asked you if it would be agreeable for Mr. Rose, whom the appraisers had first chosen as an umpire, to pass upon the estimate, and you declined. I then asked if it would be agreeable to get Jones Bros. and any other contractor to come over and go over the estimates with Mr. Gladding and Mr. Barrow, and you declined,

and then walked over to my side of my desk and picked up one of the estimates or purported appraisals, folded, put it in your pocket, and after some parting remarks, stated that you hoped I would have no personal feeling toward you, and departed."

This evidence of Gladding and Hill was not denied by Barrow, although he was at the trial. Hoff was manager of the Southern Adjustment Bureau, which acted as adjuster for fire insurance losses. He testified in part: "I have been with the Southern Adjustment Bureau since 1921. I was the representative or agent or adjuster of the companies having insurance on Mr. Hill's house, and we appointed Mr. Barrow appraiser for the insurance company. . . . Mr. Hill asked that we call in Mr. Rose, who was selected as umpire, and I told him we could not do that since the appraisers had agreed. I know Mr. W. B. Barrow. He was then and is now general contractor in Raleigh. He has acted as appraiser in fire damages to buildings that have been handled by our Raleigh office. . . . I received that letter from Mr. Hill, dated 21 December, 1928. I don't know that I answered it. I don't think that letter required a reply. So far as I know I did not answer it. I can tell from the file, but I doubt whether there was a reply to either one of those letters. After examining the file, so far as I know I did not. That was subsequent to the appraisal, and I regarded the appraisal as final. . . . *Mr. Barrow had been appraising in the neighborhood of six a year, maybe four and maybe six,* depends on what territory the fire was in. We have used Mr. Barrow as far away from home as Currituck, but hardly ever. . . . He has a *pretty good reputation in the Southern Adjustment Bureau for being a pretty good appraiser.* . . . I will not say that Mr. Barrow is always the low man. If you ask me, he usually is. *He is usually appointed by the Southern Adjustment Bureau, and is usually the low man."*

It will be noted that under the terms of the policy the appraisers selected by the parties must be *disinterested.* "In case the insured and this company shall fail to agree as to the amount of loss or damage, each shall, on the written demand of either, select a *competent and disinterested appraiser.* The appraisers shall first select a *competent and disinterested umpire,"* etc.

In Sturges Commercial Arbitrations and Awards (1930), ch. 148, at p. 371, citing numerous authorities, we find: "More general qualifications for arbitrators and umpires may be summarized by a statement to the effect that they shall not be 'interested,' 'biased,' or 'prejudiced' either at the time of accepting the office of arbitrator or umpire or during the proceedings. To be 'disinterested' it is said requires not only a lack of pecuniary interest in the outcome of the matter to be decided,

but also freedom from 'bias and prejudice.' Cases have frequently arisen under appraisal clauses in fire insurance which require that appraisals and loss and damage shall be made by appraisers who are competent and 'disinterested.' Evidence that the appointee of the insurance company under such a clause is frequently employed to appraise such losses by the appointing company or other insurance companies, and that he is paid a substantial fee therefor, is not conclusive that he is disqualified. It may, however, be evidence to go to the jury on the question of his qualifications."

The case of *Hall Bros. v. Western Assurance Co.,* 133 Ala., 637, 32 So., 257, is practically on all fours with the case at bar. At p. 640 we find: "In other words, if it be true that the appraiser named by defendant, although his selection was agreed to by the plaintiffs, was not disinterested, and this was known to defendant, but unknown to the plaintiffs at the time of entering into the agreement of submission, they are not bound by the agreement to arbitrate, and are at liberty to prosecute this suit. This would be a fraud upon the plaintiffs, and an agreement of submission to the appraiser is not a defense to this suit. *Hickerson v. Royal Ins. Co.,* 32 L. R. A., 172; *Brock v. Dwelling House Ins. Co.,* 47 Am. St. Rep., 562; *Bradshaw v. Agricultural Ins. Co.,* 32 N. E. Rep., 1055." See 143 Ala., 168, 38 So., 853.

We think the evidence in regard to Barrow's relationship with the Southern Adjustment Bureau sufficient to go to the jury. The defendants excepted and assigned error as to issues 2d, 3d, 4th and 5th. These cannot be sustained.

The issues submitted to the jury are practically those set forth in *Perry v. Insurance Co.,* 137 N. C., 402. The jury assessed the damage as $5,174. The contested award was $2,445.79. There was evidence to the effect that the house destroyed was worth before it was burned $9,200. The percentage of damage after it was burned was 85 per cent. We think this inequality, with other evidence, a circumstance to be considered by the jury. *Perry v. Ins. Co., supra,* at p. 407.

In *Knight v. Bridge Co.,* 172 N. C., at p. 397-8, speaking to the subject, it is said: "In *Perry v. Ins. Co.,* 137 N. C., 407, the following charge was approved: 'If the award is so grossly and palpably inadequate, that is, so grossly and palpably small and out of proportion to the amount of actual damage as to shock the moral sense and conscience and to cause reasonable persons to say he got it for nothing, then the jury may consider this as evidence tending to show fraud and corruption or strong bias and partiality on the part of the arbitrators'; and the Court said in *Leonard v. Power Co.,* 155 N. C., 16: 'The settled rule, which is applicable not only to awards, but to other transactions, is that mere inadequacy alone is not sufficient to set aside the award,

but if the inadequacy be so gross and palpable as to shock the moral sense, it is sufficient evidence to be submitted to the jury on the issue relating to fraud and corruption or partiality and bias'; and in *King v. R. R.,* 157 N. C., 65: *'When due weight is given to these matters, and there is evidence that the consideration is inadequate, it is a circumstance which, in connection with other circumstances, may be submitted to the jury, and if grossly inadequate it alone is sufficient to carry the question of fraud or undue influence to the jury'; and these cases were approved in Causey v. R. R.,* 166 N. C., 5." (Italics ours.)

The defendants' prayer for instruction: "The court charges you that there is no evidence that the award was procured by fraud," cannot be sustained. Fraud is not easily defined. "It is, indeed, a part of equity doctrine not to define it," says *Lord Hardwicke,* "lest the craft of men should find a way of committing fraud which might escape such a rule or definition." *Oil Co. v. Hunt,* 187 N. C., 159; *Furst v. Merritt,* 190 N. C., at p. 404. It is said: "Definitions are a bog for the unwary and a chart for the wicked."

Speaking to the subject in the *Perry case, supra,* at p. 406, is the following: "There are two kinds of fraud which will vitiate an award; positive, as by some act that can be proved; or inferential, where the circumstances so strongly point to dishonesty that the court will consider the fact of its existence to be clearly indicated. 'A common case of inferential fraud is where the award is obviously and extremely unjust.' Morse on Arbitration and Award, 539. 'Where there is a charge of fraud or partiality made against an award, the fact that it is plainly and palpably wrong would be evidence in support of the charge, entitled to greater or less weight according to the extent or effect of the error and the other circumstances of the case. There might be a case of error in an award so plain and gross that a court or jury could arrive only at the conclusion that it was not the result of an impartial exercise of their judgment by the arbitrators.' *Goddard v. King,* 40 Minn., 164."

This arbitration is under the terms of the policy. It may be noted that Laws 1927, ch. 94, makes provision for arbitration by agreement of parties.

The evidence was to the effect: That the award was signed conditionally by Gladding, with the false assurance that it was not final and the umpire could be called in, and the refusal of defendants to allow this to be done; the defendants' appraiser being practically in their employ to make appraisals for four to six a year, therefore not being disinterested, this unknown to plaintiff; the inexperience of the plaintiffs' appraiser and Barrow's taking advantage of this fact, and other facts and circumstances, were sufficient to sustain the allegations of the complaint and the verdict.

We think the position here taken amply supported by the decisions of this and other states. In the exceptions and assignments of error as to the admission of evidence, the refusal of defendants' prayer for instructions and in the charge of the court below, we can see no prejudicial or reversible error.

No error.